UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TINA LEA METCALF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:15CV1454 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of Defendant's final decision denying Plaintiff's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI") under Title XVI of the Act. For the reasons set forth below, the Court affirms the decision of the Commissioner.

**I. Procedural History**

On January 7, 2013, Plaintiff protectively filed applications for DIB and SSI, alleging disability beginning August 25, 2011. (Tr. 11, 178-90) Plaintiff alleged that she became unable to work due to heart problems, emphysema, chronic anxiety, depression, and foot problems. (Tr. 86) The applications were denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 86-115, 121) On March 7, 2014, Plaintiff testified at a hearing before the ALJ. (Tr. 664-704) On June 10, 2014, the ALJ determined that Plaintiff had not been under a disability from August 25, 2011, through the date of the decision. (Tr. 11-22) Plaintiff then filed a request for review, and on July 27, 2015, the Appeals Council denied

Plaintiff's request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the March 7, 2014 hearing, Plaintiff was represented by counsel. After counsel presented an opening statement, he questioned Plaintiff. Plaintiff testified that she was 43 years old, measured 5 feet 7 inches, and weighed 126 pounds. She was married but had been separated for years. Plaintiff stated that she stopped working because she could no longer perform the job physically or mentally. She last worked at Eagle Lake for Crown Corporation. Her previous occupations included housekeeping and nurse assistant. (Tr. 59-62)

Plaintiff stated that she quit smoking about a year ago. However, she continued to have problems with her breathing. Plaintiff described these problems as shortness of breath, wheezing, closing off, tightness, and heaviness. Activities such as walking and allergies triggered her shortness of breath. In addition, her breathing problems worsened in the summer because of the humidity. Plaintiff used an albuterol inhaler and Advair for asthma attacks. With regard to her heart problems, Plaintiff testified that she was wearing a 30-day monitor so her doctor could get more details regarding Plaintiff's chest pain and heart rate irregularity. She described the chest pain as "real sharp." Plaintiff felt weak after the chest pain subsided. (Tr. 62-65)

Further, Plaintiff testified that she saw a podiatrist for problems with her feet. Plaintiff experienced pain from a big bone in her foot. Her doctor told her she needed surgery. Standing triggered the pain. Plaintiff also took medication for headaches, which she experienced daily. The pain was a sharp, stabbing pain with some pounding. Sometimes her eyes hurt, and she became nauseous. Medication provided a little relief. Plaintiff's anxiety and depression began around 1995 and had become progressively worse over the years. Plaintiff testified that she had

difficulty concentrating, and she did not remember what she read. She did not sleep well, and she did not like being around other people because she felt closed, nervous, and panicked. Plaintiff stated that she did not deal well with stress. She became nervous and angry under stress. Further, she had trouble finishing things she set out to do and staying on task. (Tr. 65-70)

Plaintiff took several prescription medications. Side effects included headaches, nausea, sleep, and fatigue. She had a driver's license but did not drive very often. Plaintiff testified that she could walk for 10 minutes before needing to stop and rest due to shortness of breath and pain. Plaintiff experienced pain in her foot, back, and hips. She believed she could stand still for about 5 minutes and sit for 15 minutes. Plaintiff had problems climbing stairs, bending over, stooping, lifting, and carrying. She stated that it was hard for her to lift a full gallon of milk. Plaintiff did not visit with others or go to church. She had no hobbies. (Tr. 70-73)

During the hearing, Plaintiff experienced a panic attack and had to step outside. When the hearing resumed, Plaintiff testified that she lived with her two sons, ages 23 and 18. Her sons helped with household chores such as cooking, cleaning, and shopping. Plaintiff was able to put laundry in the machine and set the dryer. She sometimes folded clothes. Plaintiff had problems accomplishing those activities during the day because of her nerves and pain. She woke up around 5:30 a.m., made coffee, and took her medications. Plaintiff then sat in her recliner and looked outside. Watching TV made her nervous, and sometimes she sat with the blinds shut. She did not know how to use a computer, but she read once in a while. Plaintiff further testified that she did not talk on the phone because the phone made her nervous. Plaintiff lay down two to three times a day, but she was most comfortable in the recliner. She estimated that she sat in the recliner five to seven hours a day. (Tr. 73-77)

The ALJ also questioned the Plaintiff, who testified that sitting caused her hips, back, and knees to hurt. She stopped working because she was physically unable, and she could no longer

3

stand being around people. Plaintiff last worked as a housekeeper at a hotel. The ALJ then confirmed the medical records with Plaintiff and her attorney. (Tr. 77-79)

A vocational expert ("VE") also testified at the hearing. The VE identified Plaintiff's prior jobs as a nurse assistant, which was medium exertional and semi-skilled; and a housekeeper, which was light and unskilled work. The ALJ asked the VE to assume a person 40 to 43 years old with a 12th grade education and Plaintiff's past work experience. In addition, the person could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. The individual could sit with normal breaks for six hours in an eight-hour workday; stand and walk for six hours in an eight-hour day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally stoop, kneel, crouch, and crawl. Further, the person needed to avoid even moderate exposure to extreme cold, extreme heat, and extremes of humidity, as well as even moderate exposures to fumes, odors, dust, gases, and poor ventilation. The individual was limited to low-stress work, which the ALJ defined as simple, routine tasks in a relatively static environment with infrequent changes. The person could have superficial interaction with others. Given this hypothetical, the VE testified that the individual could perform Plaintiff's past work as a housekeeper. (Tr. 80-82)

The ALJ then reduced the lifting and carrying to 10 pounds occasionally and five pounds frequently, as well as reducing the standing and walking to two hours in an eight-hour day. Given these further limitations, the VE testified that Plaintiff's past work would be precluded. However, the individual could perform jobs such as unskilled hand packer, production worker assembler, and surveillance system monitor. If the VE further assumed that the person would be off task 15 percent of the work day or work week, the individual would not be able to perform work-related tasks and would be terminated. If the person missed work two or three days a month, he or she would be precluded from work. (Tr. 82-84)

4

Plaintiff's attorney also questioned the VE. The attorney asked the VE to assume both the first and second hypotheticals; however, the person had a marked restriction in her ability to maintain a work week schedule and be consistently punctual; her ability to complete a normal work week without interruption from psychologically based symptoms; her ability to respond appropriately to routine changes in the work setting; and her ability to demonstrate reliability. Given these additional limitations, the VE testified the individual would be unable to perform any job on a sustained, full-time basis. (Tr. 84)

On February 2, 2013, Plaintiff completed a Function Report – Adult. She reported that during the day she woke up, took her morning medication, sat in her recliner, and ate when she was hungry. Some days she put laundry in the washer and dryer and washed some dishes. Plaintiff and her son fixed supper together. She sat in the recliner and sometimes took a bath. She took her bedtime medications and went to bed. On better days she could cook a meat and a vegetable. She sat down while preparing food. Plaintiff was able to perform light house cleaning with many breaks. She did not do yard work due to the heat and humidity. She could shop for groceries, household items, personal things, and clothes. Her son helped her with shopping. Plaintiff sometimes watched TV. She did not participate in social activities, and she had problems getting along with others due to anxiety and depression. Plaintiff opined that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, stair climb, remember, complete tasks, concentrate, understand, follow instructions, use hands, and get along with others. She did not handle stress or changes in routine very well. (Tr. 241-48)

### III. Medical Evidence

On August 18, 2010, Plaintiff saw Abegaile S. Denison, M.D., for a medication refill and complaints of anxiety and pain. Plaintiff reported relationship problems and anxiety symptoms that were aggravated by stress at home or work. Her pain was located in her back and right knee,

but Dr. Denison noted that prior x-rays of Plaintiff's lumbar spine, hip, and right knee were negative. Plaintiff was anxious and fearful with a flattened affect, but the psychiatric exam was otherwise normal. Dr. Denison assessed anxiety and pain disorder associated with psychological factor. She treated Plaintiff with prescription medication. (Tr. 284-86)

Plaintiff was treated by Darla Stricklin, NP-C for asthma, allergies, anxiety, arthritis, history of DVTs, reflux, insomnia, and chronic pain. (Tr. 314-34) On April 28, 2011, Nurse Stricklin noted that Plaintiff was not always taking her Xanax because it caused fatigue. She advised Plaintiff to take the medication as prescribed. (Tr. 323)

Plaintiff presented to the ER on May 6, 2011 for complaints of shortness of breath, wheezing, and chest pain. She was transferred to another hospital and admitted for further treatment and evaluation. Her discharge diagnoses on May 9, 2011 included asthma exacerbation with probable component of chronic obstructive pulmonary disease ("COPD"); question of angioedema due to ACE inhibitor; anxiety; tobacco abuse; and hypotension early in hospital, now resolved. Dr. Steven Hart noted that the chest x-ray was normal, cardiac enzymes were negative, and the ESR test was normal. The echocardiogram report was pending, but no effusions were noted. Dr. Hart noted that Plaintiff continued to smoke despite being told multiple times that she needed to quit. In addition, he opined that her chest tightness was likely related to asthma and that the pain improved with asthma treatment. Dr. Hart believed anxiety was one of Plaintiff's biggest problems, and he discussed seeking counseling and using less medication to treat her symptoms. (Tr. 287-302; 394-416)

On July 8, 2011, Plaintiff complained of right foot pain. Nurse Stricklin noted a small amount of edema and tenderness at the first joint. Plaintiff reported a major increase in her work load which required her to spend a lot of time on her feet. Nurse Stricklin ordered an x-ray of Plaintiff's right foot and had a physician increase Plaintiff's hydrocodone dosage. (Tr. 318)

On August 8, 2011, Plaintiff saw a podiatrist, Christopher T. Sloan, DPM. Plaintiff complained of pain and tenderness in her 1st metatarsal phalangeal joint, sub IPJ lesion. The examination revealed noticeable amounts of hallux limitus, hallux rigidus deformity, and a previous x-ray showed a noticeable metatarsus primus elevatus of the 1st metatarsal which caused secondary capsulitis, arthritis, and hallux limitus deformity. Dr. Sloan noted that Plaintiff understood this condition was progressive and would require a corrective procedure in the future. (Tr. 303-04)

Plaintiff was treated by Jitendra Patel, M.D., at the Southeast Missouri Community Treatment Center. On October 4, 2011, Plaintiff reported feeling nervous and scared, and she stated she was unable to work. Dr. Patel noted Plaintiff was withdrawn, but she was cooperative with logical thoughts. He added Zyprexa and continued the rest of Plaintiff's medications. On December 17, 2011, Plaintiff reported that she continued to have severe anxiety. She did not like the Zyprexa because she was unable to do her house cleaning. Dr. Patel noted that Plaintiff was anxious and talkative. He prescribed Inderal, Xanax, and Trazodone and recommended counseling. (Tr. 342-43)

In January 2012, Plaintiff began treatment with Alicia Whitwell, RN, BC, FNP. Plaintiff reported problems sleeping. She no longer wanted to take Trazodone because it made her feel hung over the next day. Nurse Whitwell recommended OTC Benadryl. On February 10, 2012, Plaintiff reported that the Benadryl did not help her sleep. Plaintiff denied anxiety and depression. She was alert and oriented times three, and her affect and mood were appropriate. Nurse Whitwell prescribed Risperdal. On March 14, 2012, Plaintiff again denied anxiety and depression. She stated she was doing better despite not filling her Risperdal prescription. On June 18, 2012, Plaintiff complained of cold symptoms. She denied anxiety and depression, and Nurse Whitwell noted that Plaintiff's mood and affect were appropriate. (Tr. 310-13)

7

On March 15, 2012, Dr. Patel noted that Plaintiff did not take Prozac or Inderal; however, she had started counseling. Plaintiff appeared withdrawn, but she was cooperative, and her thoughts were logical. On June 14, 2012, Plaintiff was upset because she had to put her son out due to heroin abuse. She felt guilty for not working because of her anxiety. Plaintiff was tearful but cooperative. Dr. Patel continued Plaintiff's medications. On September 13, 2012, Plaintiff talked about her son's heroin addiction. Plaintiff wanted to help her son, but he did not want to quit. Plaintiff was tearful with logical thoughts. Plaintiff was again anxious and tearful when discussing her son on December 13, 2012. She told Dr. Patel that she was unable to work. Dr. Patel noted that Plaintiff was well groomed, cooperative, and logical. He continued Plaintiff's medications. Plaintiff returned to Dr. Patel on March 14, 2013. She reported that she had sleep apnea. Her son was doing better without drugs. However, she was tearful during the appointment, yet cooperative with logical thoughts. Dr. Patel added Zoloft to Plaintiff's medications. (Tr. 344-46, 504)

During 2013, Plaintiff was treated at Quality Health Care by Nurse Practitioners, primarily for complaints of sinus congestion, fever, headaches, and insomnia. (Tr. 431-65) On June 20, 2013, Plaintiff saw Darla Spain, NP for an office visit. Plaintiff reported that her blood pressure dropped at night while she slept. A recent sleep study was normal. Plaintiff stated she had been stressed lately, which increased her depression. Plaintiff reported no joint pain or stiffness, no chest pain, no wheezing or shortness of breath, and no anxiety. She did indicate a depressed mood and crying. Physical exam revealed that Plaintiff was in no acute distress. Respiratory exam was clear, and Plaintiff was able to move all extremities with full range of motion. She had a depressed affect. Nurse Spain assessed depression, fatigue, and postmenopause. She advised Plaintiff to follow up with her psychiatrist and continue taking her

medication as prescribed. Nurse Spain also recommended that Plaintiff increase her daily exercise to help with her mental and physical health status. (Tr. 453-57)

Plaintiff returned to Dr. Patel on July 9, 2013. She reported that her son was back on drugs, and she was asked to look for a counselor. On October 3, 2013, Plaintiff expressed anger that her son was still using drugs. Mental status exam indicated that Plaintiff was cooperative, and her thoughts were logical. Dr. Patel added Zyprexa. On December 3, 2013, Dr. Patel wrote a letter to excuse Plaintiff from jury duty due to her psychiatric symptoms. On January 2, 2014, Plaintiff reported that her son was still using drugs. Her younger son was doing well in school. They again discussed counseling. (Tr. 475, 502-03)

On January 25, 2014, Dr. Patel completed a Mental Residual Functional Capacity Assessment. Dr. Patel opined that Plaintiff had marked limitations in her ability to maintain a work schedule and be consistently punctual; complete a normal work week without interruptions from psychologically based symptoms; respond appropriately to routine changes; respond appropriately to routine work related stressors; demonstrate reliability in a work setting; and sustain extended periods of employment without decompensation from periodic exacerbation of psychiatric symptoms. Further, Dr. Patel assessed moderate limitations in Plaintiff's ability to maintain adequate attention, concentration, and focus on work; work in coordination with or in close proximity to others; and accept instructions and respond appropriately to criticism from supervisors or co-workers. Dr. Patel listed Plaintiff's pertinent clinical history as severe anxiety and depression, and he referred to the treatment records and progress notes for symptoms and diagnoses. He noted that Plaintiff was treated with prescription anti-anxiety and anti-depressant medications. Dr. Patel also referred to the treatment records and progress notes to provide his opinion regarding the extent Plaintiff's mental impairment affected or prevented her from engaging in any kind of sustained, full-time, competitive employment. (Tr. 473-74)

On March 3, 2014, Kimberly Yeager, NP, completed an Assessment for Social Security Disability Claim. She listed Plaintiff's diagnoses as osteoarthritis, insomnia, anxiety, depression, and angina. Nurse Yeager noted that Plaintiff had reported lower back pain and had an MRI pending. Plaintiff also reported severe pain with walking. She maintained that she was unable to have full-time employment due to anxiety and depression. X-rays of Plaintiff's lumbar spine were normal. (Tr. 476-77)

Marc K. Lewen, D.O., treated Plaintiff for complaints of chest pain. On March 27, 2013, he noted that Plaintiff's Prinzmetal Angina was stable. He was not convinced the condition was real. On December 16, 2013, Dr. Lewen noted that Plaintiff was labeled as having variant angina, of which he was not convinced. He stated that Plaintiff was well-controlled on her current medical regimen. Dr. Lewen ordered a 30 day event monitor. Plaintiff returned to Dr. Lewen on April 14, 2014 for continued complaints of chest pain. Dr. Lewen noted that Plaintiff's pain was atypical and not suggestive of cardiac etiology. The 30-day event monitor was unremarkable for evidence of arrhythmia. Physical exam was normal, and Plaintiff's mood was appropriate. (Tr. 421-25, 496-98)

### IV. The ALJ's Determination

In a decision dated June 10, 2014, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. She had not engaged in substantial gainful activity since August 25, 2011, her alleged onset date. The ALJ determined that Plaintiff had severe combination of impairments, including chronic obstructive pulmonary disease (COPD)/asthma; degenerative joint disease; sinus bradycardia/arrhythmia; dyslipidemia; gastroesophageal reflux disease (GERD); depressive disorder; and anxiety disorder. However, Plaintiff did not have an impairment or combination of impairments that met or medially equaled

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-16)

After carefully considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently. She could sit, with normal breaks, for six hours in an eight-hour day, and stand and walk, with normal breaks, for six hours. Plaintiff could occasionally climb ropes and stairs, but she could never climb ladders, ropes or scaffolds. In addition, the ALJ found that Plaintiff could occasionally stoop, kneel, crouch, and crawl. However, she needed to avoid even moderate exposure to extreme cold, extreme heat, extremes of humidity, fumes, odors, dusts, gases, and poor ventilation. The ALJ limited Plaintiff to low stress work, defined as simple, routine tasks in a relatively static environment with infrequent changes. Plaintiff could have superficial interaction with others, defined as no negotiation, confrontation, arbitration, medication, and supervision or persuasion of others. The ALJ found that Plaintiff was capable of performing her past relevant work as a housekeeper because this job did not require the performance of work-related activities precluded by her RFC. Thus, the ALJ concluded that Plaintiff had not been under a disability from August 25, 2011 through the date of the decision. (Tr. 16-22)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's

impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, Plaintiff raises three arguments. First, Plaintiff argues that the ALJ failed to properly evaluate the opinion evidence. Plaintiff next argues that the ALJ failed to properly consider Plaintiff's RFC. Finally, Plaintiff asserts that the ALJ failed

---

[1] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

13

to fully and fairly develop the record. In response, Defendant contends that the ALJ properly considered all of the evidence in the record as a whole to determine her RFC.

## A. Medical Opinion Evidence

Plaintiff first argues that the ALJ failed to afford proper weight to the expert opinions in this case. Specifically, Plaintiff contends that the ALJ failed to give controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. Patel. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, the record shows that the ALJ thoroughly considered the medical records and gave proper weight to the medical opinion evidence. Specifically with regard to Dr. Patel, the ALJ gave his opinion little weight because it was inconsistent with his treatment notes. While Dr. Patel found marked limitations in several areas of functioning, his treatment records reflected

14

that Plaintiff was cooperative with logical thought processes. The ALJ noted that Plaintiff regularly presented to her examinations without any observations of significant mental health symptoms.[2] (Tr. 21) "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) (citations omitted). Additionally, Dr. Patel appeared to base his opinions on Plaintiff's subjective reports, as the objective data and treatment notes were inconsistent with the marked limitations in several areas of function. *See Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (finding the ALJ properly discounted the consulting psychologist's opinion where it was based on plaintiff's subjective complaints and not objective findings and was inconsistent with the psychologist's own notes). Dr. Patel also failed to provide any explanation for the marked limitations that he assessed. "[A] conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (quoting *Wildman*, 596 F.3d at 964). While Dr. Patel directed the reader to refer to the medical treatment records and progress notes, the ALJ properly noted that the treatment records were inconsistent with the extreme limitations contained in the Mental RFC Assessment. (Tr. 21)

Further, as noted by the ALJ, the entire record showed that Plaintiff reported doing better despite not filling her Risperdal prescription, and her mood and affect were frequently normal during psychological exams, with no complaints of anxiety or depression. (Tr. 18-20, 286, 310-14, 316-19, 323-25, 329-31, 333-34, 355, 422, 428, 436, 461, 464) Thus, the ALJ correctly found that Dr. Patel's assessment was unsupported by the evidence as a whole and by his own

---

[2] The Court notes that the ALJ found that the treatment notes did not indicate that Plaintiff presented with poor grooming or hygiene, which contradicted the statement of marked ability to maintain hygiene. (Tr. 21) The assessment actually found mild limitations to this area of functioning. (Tr. 473) However, the Court finds the inconsistencies between Dr. Patel's treatment notes and the marked restrictions in his assessment are sufficient to discount his opinion.

15

treatment notes and properly gave his opinion little weight. *See Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011) ("Upon reviewing the entire record, we conclude that there is substantial evidence to support the ALJ's finding that certain opinions in the Medical Source Statement are inconsistent with [the treating physician's] own treatment notes and other relevant evidence.").

### B. The ALJ's RFC Assessment

Next, Plaintiff argues that the ALJ failed to properly consider Plaintiff's RFC. Specifically, Plaintiff contends that the ALJ failed to define the term "moderate" when finding that Plaintiff had a moderate limitation in the area of concentration, persistence, or pace. The record belies Plaintiff's claim.

In the opinion, the ALJ limited Plaintiff to "low stress work, defined as simple, routine tasks in a relatively static environment with infrequent changes." (Tr. 16) While the regulations do not define "moderate," courts in this district have held that limiting a plaintiff to simple, repetitive tasks in a low stress work environment sufficiently accounts for a moderate impairment to concentration, persistence, or pace. *See* 20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4) (listing moderate as a degree of limitation with no specific definition provided); *see also Bernal v. Colvin*, No. 1:14-CV-80 (CEJ), 2015 WL 4746987, at *31 (E.D. Mo. Aug. 11, 2015) ("[T]he ALJ adequately accounted for plaintiff's moderate impairment in his ability to maintain concentration, persistence, and pace by limiting him to simple, repetitive tasks in a low stress environment."); *Lynn v. Colvin*, No. 2:14-cv-6 NAB, 2014 WL 5475455, at *2 (E.D. Mo. Oct. 29, 2014) ("[T]he ALJ's RFC determination adequately accounted for [plaintiff's] moderate limitations regarding concentration, persistence, or pace by limiting her to simple, repetitive tasks."). The Court therefore finds that the ALJ properly incorporated Plaintiff's moderate impairment in concentration, persistence, and pace into the RFC determination.

Plaintiff further contends that the ALJ erred by failing to properly evaluate Dr. Lewen's diagnoses regarding chest pain when considering limitations to concentration, persistence, and pace. However, the ALJ thoroughly reviewed the record and found that Plaintiff's sinus bradycardia/arrhythmia were severe impairments. (Tr. 13) The ALJ also noted Dr. Lewen's opinion that Plaintiff had no functional limitations associated with her angina complaints. (Tr. 20, 421, 426) Additionally, the cardiac event monitor was unremarkable for evidence of arrhythmia, ST segment shift despite Plaintiff's complaints of chest pain. (Tr. 497) Dr. Lewen opined that Plaintiff's pain was atypical and not suggestive of cardiac causes. (Tr. 496) The ALJ specifically noted that he considered Plaintiff's chest pain and diagnosis of sinus bradycardia/arrhythmia, but found Plaintiff's pain to be well controlled with medication and not disabling in combination with her other impairments. (Tr. 20) Indeed, Dr. Lewen noted that Plaintiff's condition was well controlled with medication, and he continued her on a medication regimen. (Tr. 421, 425, 497) "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted). Nothing in the objective medical evidence demonstrates that Plaintiff's chest pain caused functional restrictions more limiting than those in the RFC determination. As previously stated, Dr. Lewen found no functional restrictions. *See Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) (stating the ALJ may properly consider the fact that no physicians issued work restrictions in determining whether the plaintiff can work). Thus, the Court finds that substantial evidence supports the ALJ's decision to not include additional limitations stemming from chest pain. *Cypress v. Colvin*, 807 F.3d 948, 951 (8th Cir. 2015).

### C. Development of the Record

Finally, Plaintiff claims that the ALJ failed to properly develop the record and should have ordered a consultative examination to clarify the combined effects of her heart problems on

17

her RFC. Plaintiff also claims that the Defendant should have ensured that the ALJ received Plaintiff's counseling records. With regard to consultative examinations, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether Plaintiff is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citation omitted). Here, the record contained thorough documentation of Plaintiff's heart problems from a heart specialist. *Id.* Therefore, the ALJ did not breach a duty to develop the record because the record contained sufficient evidence from which to make an informed decision. *Ulrich v. Astrue*, No. 2:10CV89 JCH(LMB), 2011 WL 7401681, at *13 (E.D. Mo. Dec. 2, 2011).

Additionally, while Plaintiff mentioned counseling, she did not identify the service provider for the Defendant to request records. Further, the record is unclear as to whether she received consistent counseling, as treatment records from Dr. Patel indicate that Plaintiff sought counseling in 2012 but was looking for counselor in 2013. (Tr. 344, 502-03) Indeed, Plaintiff's brief does not provide the name of a counselor or any specifics regarding these "records from a counselor." The ALJ left the record open for Plaintiff to submit additional evidence, yet she did not submit any counseling notes to the ALJ, the Appeals Council, or this Court. "It is the claimant's burden to submit evidence to support his or her claim." *Quick v. Colvin*, No. C15-3090-LTS, 2016 WL 698087, at *5 (N.D. Iowa Feb. 19, 2016) (citation omitted). The duty to develop the record is triggered by Plaintiff making the ALJ aware of development needs. *Id.* (citations omitted). Such is not the case here, where Plaintiff had multiple opportunities to submit the counseling records or inform the ALJ that this area needed further development, yet she failed to do so. "While it is truly unfortunate that the additional evidence did not make its way into the record this omission is entirely attributable to [Plaintiff], not to any failure by the ALJ to fully and fairly develop the record." *Id.* Thus, the Court concludes that substantial

evidence based on the record as a whole supports the ALJ's determination that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this 21st day of September, 2016.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**